[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, whose birth name was Wendover, and the defendant were married on August 5, 1978 in Kent, Connecticut. The parties have resided in the State of Connecticut for the statutory period. The parties have three (3) children, Michael, born September 9, 1982, Molly, born November 24, 1984, and Abigail, born June 11, 1988. The jurisdictional issues are joined and the matter was tried to disposition on January 31, 1995 and February 1, 1995. It is clear from the evidence that the marriage between the parties has irretrievably broken down, and a decree of dissolution entered following the close of the evidence.
The plaintiff has a high school education, and training as a beautician, which is how she remains employed, on a part-time basis. She also works part-time cleaning houses and transporting children to pre-school. Her work is limited because her mother no longer lives in the area and is no longer available to care for the children. On cross-examination an issue was made as to whether she made more as a hairdresser. The record reveals different amounts filed on affidavits during the pendency of this action. However, what is clear to the court is that the plaintiff makes quite a bit less per week than the defendant, who was always the primary money-earner in this family. His income potential with equivalent educational background is no less than five times her earning potential, in light of the additional demands of child care.
The parties met in 1976, and began dating in 1977. She was residing with her mother, and the defendant was in the armed forces, stationed in North Carolina. The plaintiff testified that their marriage was fine until the birth of their first child. Before that, the plaintiff was totally available for her husband. She complained that his demands for sex were extreme and not mindful of her needs, either for rest or for safety at times that she was in the very last stages of her pregnancies. She testified that each of her children was born in the early morning hours after the defendant had insisted upon intercourse during that evening. She testified that he desired intercourse each day, and would be angry if she refused him. At times, he would agree to refrain from intercourse, but requested other CT Page 1431-B forms of sexual gratification.
On cross-examination, the plaintiff testified that while there was no physical force imposed upon her to have sex during the last two-thirds of the marriage, there was mental intimidation. She felt that the defendant did not love her, but that he worshiped her, and that she did not feel loved as a person. The court believes that she was treated as an object. She testified that control was an issue for him, and that even his "parenting plan" as contained in the defendant's claim for relief are engineered to retain control.
The level of sexual demand is found by the court to have been demeaning and disrespectful. The demeanor of the witness on the stand was one of complete embarrassment and sorrow. Of note, was the response of "Yes, Sir, No, Sir" to each of the non-objected-to questions on direct examination and during cross-examination. The witness was credible when she testified that she felt that she had been split into three people; a mother, a wife, and a sexual partner. She was believed by the court when she testified that she felt that she could no longer love someone who was not loving to his children.
Her testimony was that he was openly hostile to the children, did no activities with them, and was abusive and demanding of them. She conceded that he had assisted in the volunteer effort with her and their community to construct a "Playscape." She also agreed that, with friends, he had taken their son to auto shows. She claimed that he stated that he resented the children while the couple was in counseling, and felt that the children had suffered from his attitude toward them.
While the parties have agreed to joint custody, and it appears that they had had a schedule, it has not always worked, especially, according to the plaintiff, when she has important plans. The parties did not participate in the mandatory Parenting Education Program prior to this proceeding. It appears that the difficulties surrounding this proceeding, and the level of suspicion concerning the children, that they would be well served if the parties reported back to the court six (6) months from the date of judgment, and that they seek further counseling surrounding visitation issues, so long as all safety issues are met. CT Page 1431-C
The plaintiff testified that the defendant had little contact with his family of origin, and that they even had Christmas celebrations with only part of his family at each. While the defendant had somewhat reconciled with his sister, they were still estranged from their mother, who had since divorced his father. During his testimony on cross-examination, the defendant testified that he had sent the plaintiff a calendar during the pendency of this action, reducing the amount of time he spent with his children, because he needed more time for himself. The court finds that the plaintiff's testimony concerning his involvement with his children is credible, and that his commitment to his family was only consistent as his sexual needs were met.
The plaintiff claimed that the defendant had attempted to work with her and share responsibilities and a relationship with the children on two occasions where she spoke to him concerning a divorce. On the third time they spoke of divorce, she claimed he made lists of what money he would retain, and what money she would not receive as a result of any dissolution.
The parties purchased a house in Sharon, then built a house in Canaan, and then another in Sharon. The plaintiff claimed that she had done much work on the construction of the homes, while conceding that the defendant was in the construction trades. The plaintiff agreed that during the marriage, the parties built and renovated three properties. She conceded that he spent a great deal of time on the homes that they have lived in. Most of that work, according to the plaintiff was done on weekends.
The plaintiff kept the books for the defendant's construction business. She logged in his checks, and did not claim to be a bookkeeper. The plaintiff stated that she paid all of the family bills with approximately $4,500.00 per month, and that she deposited the rest of the money into the savings account. The parties maintained joint accounts, and each contributed into the family expenses as they were able. The income from the plaintiff's hairdressing business and the defendant's side jobs and snowplowing, all undeclared income for tax purposes, were used by the parties for vacations.
The plaintiff is currently romantically involved, and denied CT Page 1431-D that that relationship commenced prior to the separation of the parties, which separation occurred on January 31, 1995, one year to the day of the commencement of this trial, when the defendant vacated the family home. While the defendant made innuendoes concerning this relationship, there was no evidence to produced from any source to contradict the testimony of the plaintiff as to the commencement of that relationship.
The plaintiff has a horse, and spends funds on that personal property. The defendant seemed to have great concern that the plaintiff's significant adult friend also rode horseback with her, especially on the marital property.
The defendant testified that he had a high school education, and that he went into the Marine Corps from 1974-1977. He worked for his father's automotive dealership in Kent, and he met and lived with the plaintiff for approximately one year before their marriage. He indicated that their sexual relationship during that time was good. He testified that he was in love with his wife and continued to be throughout the marriage. He tried to provide everything financially for her, and that they planned their family so that they established themselves before starting a family.
They purchased property in Sharon in 1981 with a VA loan. The property needed to be rehabilitated. They added a second floor addition, and many other improvements. In 1984, they purchased their second Sharon home, the marital property which is at issue in this case. He was not aware of any problems in the marriage during this time.
He agreed that they had had intercourse within two weeks of Michael's due date, but felt that it was mutual. He agreed that her water broke during that night and that Michael was born early. He claimed that he never forced her to have sex, and that after Michael was born, the frequency of their sex was reduced to two or three times per week. He admitted that his condom broke when they had intercourse two weeks after Michael's birth. He agreed that it was a very embarrassing for them.
He testified that she had many requests of him to improve their properties. In 1984, they acquired the Tone Drive, Canaan, property. They cleared and built the home. Much of the construction was done by contacts within the construction trade that he had, and the balance of the work was done by him on the CT Page 1431-E actual finish work. The shell had been constructed by Berkshire Homes. It was originally intended to be an interim home for them.
He felt that the plaintiff was too attentive to the cries of their first child, and agreed that he often slept through the children's cries. He did not change diapers or attend to the children if they were ill. He admitted that he would vomit if the children did. He claimed that he bought a go-cart for Michael, while the child was young, with the hopes that they would work on it together and then ride it. He agreed during cross-examination, consistently with her testimony, that that never occurred and that the go-cart rusted and was discarded without ever being used. They attended the Pinewood Derby, and a camp out with the scouts. He agreed that the truck shows they attended were with others. He testified that they did snowplowing together, and that they visited an uncle and grandfather together.
He agreed that his activities with the female children were limited. He testified that "he didn't know what to do with girls." He claimed that that was because of his work schedule, their school schedules, and evening activities of the family.
The defendant also had to meet with prospective clients after work, or work on drawings or estimating, while he watched TV each evening. He did many projects in and around the house. He claimed that for years their life was very busy. The Alberta Road property, the current family home, was also to be an interim home, but after the failure of the real estate market, they put their other plans on hold. He testified that he did the entire construction project himself. He claimed he worked from sun up to sun down on the project, and lost his job with his brother-in-law during that time. He acquired another job quickly, so it did not impact on their ability to continue on this project. It was as a result of this that he stopped speaking to his sister.
The defendant offered photographic exhibits with respect to the last two home construction projects. (Def.'s 2-) He continued to improve the property, and built a horse barn on the property. He testified that he did all of this work willingly because he was "proud of his wife and children", and because he thought their marriage was happy and sound. He claimed that he knew of no problems in the marriage until November of 1994 when CT Page 1431-F she told him that she no longer wanted a marriage with him. He claimed that the only thing she had ever said was twice telling him to have a better relationship with their children.
He claimed on cross-examination that he did not know that she thought that the frequency of intercourse was excessive. He admitted that he masturbated onto her several times, even though she did not like it. On certain occasions, he continued this practice, despite her getting out of bed and leaving the room when she was awakened by his activity. He also admitted having anal sex with her when she had her period and did not want to engage in intercourse.
They went to marriage counseling for approximately six weeks. He attempted to take some time off from work to reconnect with the children, but she felt it was only a temporary attempt and would not mean real change. He now lives in a small apartment in Lakeville, which the plaintiff saw and approved as clean enough for the children to stay in.
He agreed during cross-examination that the parties worked together on the construction projects. He agreed that the work on the Alberta Road, Sharon, property was still not complete because it was an after-work project. He agreed that the improvements to their homes was for them as a family.
He was asked several questions on cross-examination concerning his business, which is not incorporated. He controls draw, and the check registers from his business were made exhibits in this case. (Pl.'s 1) A summary of those transactions were also made exhibits (Pl.'s 2). Many personal expenses were paid from the business account, either paid to the wife, or for personal items. He conceded that this occurred. The defendant had a copy of the list on the evening of January 31, to compare, and was asked concerning expenses. Plaintiff's 3 is a list of checks for taxes and storage that are claimed to be in addition to Plaintiff's 1. The payment for gas is made out of the business account, mostly at the Nutmeg Pantry, which checks might have included addition cash into his pocket.
The check draw in the exhibits were claimed by the defendant not to be exclusively personal expenses. The total amount of cash withdrawn was $4,620.00. Of that cash, some of that was business gas for his truck. The total is approximately CT Page 1431-G $1,000.00 for his personal use in calendar year 1995. His draw was approximately $58,000.00. The parties examination of each others incomes was of minimal consequence, although it appears from the testimony and the exhibits that the income of the defendant exceeds that disclosed on the face sheet of his financial affidavit.
In 1995, his net reportable income from his business was approximately Fifty two Thousand ($52,000.00) Dollars. His affidavit discloses income of One Thousand, Two Hundred Seventy-seven ($1,277.00) Dollars per week. Page three of his financial affidavit discloses net operating income of Sixty-eight Thousand, Nine Hundred, Eighty-five ($68,985.00) Dollars, as well as the gross income of Two Hundred, Forty-nine Thousand ($249,000.00) Dollars. His cost of doing business was One Hundred, Sixty-six Thousand ($166,000.00) Dollars, leaving Eighty-two Thousand ($82,000.00) Dollars, from which he deducted certain depreciation and truck expenses.
The gross income reflected on his financial affidavit is less that the actual figures contained on the schedule attached thereto. His weekly income from the net operating 1995 income would yield One Thousand, Three Hundred Twenty-six ($1,326.00) Dollars per week. Because he took as a deduction the storage rental which was merely a part of his personal rent, the plaintiff argues that an additional Two Thousand should be added, making his real income Seventy-one Thousand ($71,000.00) Dollars. The defendant contends that the payment by him of Two Hundred ($200.00) Dollars per month as storage of business equipment is not income to me is not persuasive to the court. While it may be a perfectly acceptable tax deduction, it is includable in his income for the assessment of child support. The lease of the rental premises (Pl.'s Exh. 4) describes the leased premises and is silent as to garage space. The court need not find with exactitude the actual income of the defendant in order to make its financial orders. By admission contained within the financial affidavit filed, the court finds that the defendant has the ability to earn approximately Seventy Thousand ($70,000.00) Dollars per year. The plaintiff will earn approximately one-fifth of that amount until the children are self-sufficient and she is able to work full time. When she works full time, she will not be able to earn to her spouse's level.
The defendant has a debt to the Salisbury Bank and Trust CT Page 1431-H Co. for Twelve Thousand ($12,000.00) Dollars, which was for attorney's fees. The retainer and fees have totaled approximately Fifteen ($15,000.00) Dollars, and he owes taxes to the IRS and to the State of Connecticut. His auto expense on his financial affidavit is covered by the business.
The defendant traded in his snowplowing truck and traded it for the newer truck he currently drives, and no longer does a side job of snowplowing. He complained that she had gone to various town offices to retrieve building permits which reflected his work, and that she had spoken ill of him to some riding friends who spoke to their acquaintances for whom the defendant was commencing construction of a million-dollar home. As a result, he claimed that the second phase of that project would be put out to bid rather than being a "sure thing" for him. He blamed he interference with his business for the difficulty. His claim is speculative at best, and does not provide this court with any reason to believe that it will affect his ability to earn at the level he is currently demonstrating his earnings. This testimony, if credited at all, appears to the court to be only an attempt to set up a motion for modification of any child support or alimony payments. His earning ability appears to have been proved in this case as found above.
The defendant now states that he needs more time for himself, and has decreased the time he spends with his children. By prioritizing his own needs over those of the children, he corroborates the claim of the plaintiff that he objectified her and their children. He appeared to the court to be emotionally flat, and unfeeling. He lacked insight into the safety issues of his insistence to engage in an act of vaginal intercourse with his wife within two weeks of the delivery of their first child, subjecting her to a danger of infection and the requirement that she take a course of anti-biotics during her post-partum period. Moreover, he lacked insight into her needs to recover emotionally from the delivery and to reorient herself and to adjust to being a new mother. He continued a course of behavior toward her which disregarded her important duties to their children, while attempting to balance her desire, as articulated by her, to be "a good wife."
The plaintiff submits proposed orders and in final argument indicates that the parties had agreed to language for joint custody and visitation. The agreement takes into account the CT Page 1431-I defendant's articulated desire to have time for himself. The plaintiff argues then that the plaintiff will require full financial support, and that the requests in the claim for relief, which are predicated on income of Seventy-one Thousand ($71,000.00) Dollars, allow for plaintiff and three children to have sixty (60%) percent of the income available from both parents, and the defendant forty (40%) percent of that income.
The plaintiff argues that she will never attain the income level of the defendant, and she argues that she is entitled to forty (40%) percent of the business assets.
The defendant claims that he attached his operating statement to his financial affidavit and that it is appropriate for him to take the depreciation figure as against income. He also claims that the plaintiff did not sufficiently disclose her income because of the sporadic and part-time nature of her employment. The defendant claims that she estimated her income without basis in fact, and that she had more of an obligation to the court.
The defendant claims that he loved his wife and thought that they had a good marriage, and that her failure to tell him of her difficulty with their intimate life, waiting until her horse barn was constructed to tell him that their marriage was over was unfair. He claims that the home be sold immediately. The defendant claims that that would be a fair disposition FOR HIM. While it is deemed "arguable" by him through his counsel, that the children would be happier in their home, he claims that it would not be fair FOR HIM to have her riding her horse with her new boyfriend at the marital home.
The court has reviewed all of the statutory criteria for the distribution of marital assets, in conjunction with all of the evidence in the case, and finds that the fault for the breakdown of this marriage lies in the defendant's narcissism and view of the usefulness of his spouse as a sex object, and his unwillingness to engage in any meaningful role as a father. That is compounded for the court by the incredible argument of counsel that the family home be immediately sold. It was clear from the argument that even the defendant knew that that was not in his children's best interest, but his selfish needs to prevent her from enjoying that property with another man overrode any recognition of responsibility one would expect from him with respect to providing for the family he helped create, CT Page 1431-J and which family relied most substantially on him for their continued support.
It is clear from the plaintiff's claim for relief that this case was only tried to conclusion because of the insistence of the defendant in arguing his view of the world, and his insistence in having his own needs met, regardless of his responsibilities. The court cannot say that the claim of the plaintiff is unreasonable. In fact, the court finds that the claim of the plaintiff was reasonable under the facts of this marriage, and the failure of the defendant to reach an accommodation and force her to expend attorneys fees to prosecute this action should be chargeable to him. While the court observes that he has no liquid funds with which to pay a lump sum, the court orders that the attorney's fees and costs of trial litigation, that is preparation and actual trial, from the date of January 25, 1996 to conclusion of trial on February 1, 1996, be paid by the defendant on a monthly schedule that is agreed to by plaintiff's counsel. The court will retain jurisdiction over the payment amount should the parties fail to agree.
Based upon the court's review of the evidence, exhibits, and Conn.Gen.Stat. Sec. 46b-81, et sec., the court makes the following orders:
1. CUSTODY AND VISITATION: The court will adopt the language of the parties as it relates to how the children will spend time with each of their parents. The court has previously opined that the parties must take the Parenting Education Program, and engage in counseling on child-related issues if in a period of six (6) months, Family Services, on review, believes it is in the best interests of the minor children. The court at that time will determine if counsel for the minor children is appropriate. The court only ratifies this agreement for joint custody insofar as the court hopes that the parties will work together to ensure their children's happiness during the post-judgment phase of this proceeding. The court is not convinced by the evidence at trial that joint custody is in the best interests of the children unless the parents act as the law expects them to act to nurture and support their children.
2. CHILD SUPPORT: The father shall pay the sum of Three Hundred ($300.00) Dollars per week as child support, based upon the finding of the court as to his current income. Child CT Page 1431-K support shall continue during the natural lives of the children, until he or she is eighteen, or if he or she remains in high school during their eighteenth year, until he or she is nineteen.
Child support shall be by contingent wage execution, and be paid directly between the parties, rather than through the State of Connecticut.
3. HEALTH RELATED EXPENSES: The father shall continue to provide medical and/or dental insurance for the benefit of the minor children as is currently in force with Golden Rule, or with a company that provides like coverage. The father shall pay seventy-five (75%) percent of the unreimbursed health-related expenses for the minor children, and the mother shall pay twenty-five (25%) percent of those expenses. The provision of Conn.Gen. Stat. Sec. 46b-84(d) shall apply.
4. LIFE INSURANCE: The father shall name the children as irrevocable beneficiaries of his current life insurance policy, and retain that policy, with a current fact value of One Hundred Sixty Thousand ($160,000.00) Dollars in full force and effect during the period of his obligation to pay child support. The mother shall be named their trustee until they reach the age of majority.
5. TAX EXEMPTIONS: The father shall take the two oldest children as tax deductions each year that he is current with child support, and the mother shall take the youngest minor child. Should there be an order of child support which results in mother be more proportionately responsible for the support of the children for any reason, this order may be subject to modification.
6. ALIMONY: The defendant husband shall pay alimony to the plaintiff wife in the sum of One Hundred ($100.00) Dollars per week, until her death, remarriage, or cohabitation under the terms of the statute. The court finds that this marriage is a long-term marriage, and finds that the disparity of income between the parties requires the payment of alimony. Alimony will be modifiable as to amount, and will in any event be reduced to One ($1.00) Dollars per year, upon the eighteenth birthday, or graduation from high school, or nineteenth birthday, whichever last occurs, of the youngest child, Abigail. CT Page 1431-L
7. MEDICAL INSURANCE: The defendant husband shall continue to cover the plaintiff on his medical insurance for a period of two (2) years, and she shall contribute back to him one-half of the cost thereof. This payment shall be construed as further alimony for tax purposes.
8. REAL ESTATE: The mother and children shall continue to reside in the marital home, and be granted sole possession thereof, until Abigail is not legally entitled to be supported by her father, or unless the plaintiff mother dies, remarries, or cohabits with an unrelated male as defined in the statute.
Upon the happening of one of those events, the house will be sold, or the plaintiff may purchase the defendant's interest therein. For purposes of distribution of sale proceeds, or to determine his share for buyout purposes, the net proceeds shall be considered to be the payment of the first mortgage as is currently in place, adjustments for taxes, commission, and any other customary closing expense or adjustment, whereafter the plaintiff shall receive Sixty (60%) percent of those proceeds, and the defendant shall receive Forty (40%) percent. The plaintiff shall further receive a credit of Sixty (60%) percent of all principal payments towards the mortgage balance from the date of the judgment to the date of sale or buyout.
The value of any interest in the marital home shall be determined by agreement, or absent that agreement, by the selection of an appraiser that is agreed to between the parties. If they fail to agree, then each shall select and pay for an appraiser, which appraiser shall select a third, and the third shall value the property, and be paid equally by the parties.
The parties shall share any repair to the home which costs more than One Hundred, Fifty ($150.00) Dollars. No repair shall be done without written agreement of the parties, and the defendant shall be asked to perform the repair at his cost to maximize the availability of family funds to support the children.
While the plaintiff mother in residing in the home with the children, she shall pay the mortgage, taxes, and insurance on the marital property. CT Page 1431-M
If the property is to be sold, the defendant shall have the right of first refusal, which must be exercised within twenty (20) days after notification of an offer from a bona fide purchaser, to the defendant by certified mail, return receipt requested, or by service in hand by a person authorized to serve process in the State of Connecticut.
9. BUSINESS ASSETS: The defendant shall retain all of his right, title, and interest, in and to the business and its assets, from which he will continue to be expected to support his family. The interest claimed by the plaintiff is speculative, although she claims an interest in the assets only of the business, but based on the other court other orders, the court is of the opinion that he should conduct his business unhampered by further claim of the plaintiff.
10. AUTOMOBILES: The plaintiff shall retain possession of a 1991 Pontiac automobile, and the defendant shall cooperate in any paperwork required by the Department of Motor Vehicles, should that automobile be in his name or joint names. She shall be responsible for any outstanding loan on that vehicle, and for any taxes thereon.
11. DEBTS: The parties shall pay the debts on their respective financial affidavits, and hold the other harmless therefrom.
12. The court, upon entering the decree, restored to the plaintiff her birth name, Lois A. Wendover.
Judgement shall issue consistent with this opinion.
DRANGINIS, J.